1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**

7 **EASTERN DISTRICT OF CALIFORNIA**

8

9 MARSHALL GREGORY,                                    **CASE NO. 1:13-CV-2070 AWI SMS**

10                     **Plaintiff**

                                                      **ORDER ON DEFENDANT'S MOTION**
11          v.                                        **FOR SUMMARY JUDGMENT**

12 **UNITED PARCEL SERVICE, INC., and**
   **DOES 1-25 Inclusive,**
13
                      **Defendant**
14

15

16        This is an employment discrimination case brought by Plaintiff Marshall Gregory

17 ("Gregory") against his former employer Defendant United Parcel Service ("UPS").  Gregory

18 alleges three causes of action under California Government Code § 12900 et seq., the Fair

19 Employment and Housing Act ("FEHA").  Specifically Gregory alleges disability discrimination

20 under § 12940(a), failure to accommodate under § 12940(m), and failure to engage in the

21 interactive process under § 12940(n).  UPS moves for summary judgment on all claims alleged

22 against it.  For the reasons that follow, UPS's motion will be granted in part and denied in part.

23

24                            **SUMMARY JUDGMENT FRAMEWORK**

25        Summary judgment is proper when it is demonstrated that there exists no genuine issue as

26 to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

27 Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

28 Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

1   the initial burden of informing the court of the basis for its motion and of identifying the portions

2   of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

3   issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty

4   Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

5   of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

6   (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

7   a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

8   moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d

9   509, 514 (9th Cir. 2010).

10          Where the moving party will have the burden of proof on an issue at trial, the movant must

11  affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

12  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

13  issue at trial, the movant may prevail by presenting evidence that negates an essential element of

14  the non-moving party's claim or by merely pointing out that there is an absence of evidence to

15  support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

16  Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

17  fails to carry its burden of production, then "the non-moving party has no obligation to produce

18  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

19  Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

20  meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

21  issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

22  Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

23  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

24  forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

25  Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

26          The opposing party's evidence is to be believed, and all justifiable inferences that may be

27  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

28  Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

2

1    (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

2    inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

3    899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly

4    D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

5    air, and it is the opposing party's obligation to produce a factual predicate from which the

6    inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

7    2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

8    issue of material fact does not spring into being simply because a litigant claims that one exists or

9    promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

10   15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

11   2002).  The parties have the obligation to particularly identify material facts, and the court is not

12   required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo

13   Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be

14   defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson,

15   477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the

16   nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

17   moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

18

19                              **FACTUAL BACKGROUND**[1]

20        UPS is a package transportation and delivery company that operates on a worldwide basis.

21   DUMF 1.  UPS employs over 70,000 Package Car Drivers, who deliver and pick up packages in

22   the familiar brown vehicles throughout the country.  See DUMF 2.  The job of a Package Car

23   Driver is physical, as they are required to lift and carry packages, and climb in and out of their

24   vehicles up to several hundred times per day.  DUMF 4.

25        UPS's Package Department is organized around "centers," which correspond to particular

26   geographical areas or ZIP codes.  DUMF 5.  UPS Package Car Drivers are assigned to centers, and

27

28   [1] "DUMF" refers to "Defendant's Undisputed Material Fact," and "PRDUMF" refers to "Plaintiff's Response to
     Defendant's Undisputed Material Fact."

1    they pick up and deliver packages within their center's geographic area.  Id.  Centers typically

2    include anywhere from 30 to 60 drivers, and more than one package center may be housed in the

3    same UPS facility.  DUMF 6.  "Hubs" are the large distribution facilities that receive packages

4    from centers and other hubs.  DUMF 7.  Packages are sorted by geographic area at each hub (by

5    "Small Sort" employees), and then distributed either to another hub or to a center served by the

6    hub, depending on the delivery destination.  Id.  UPS's Feeder Department is responsible for

7    moving packages between hubs and centers.  DUMF 8.  Feeder Drivers drive large tractor-trailers,

8    filled with packages that they transport between UPS facilities.  Id.  In Fresno, there are two

9    package centers which are both within the Fresno Hub.  See DUMF 6.

10   The International Brotherhood of Teamsters represents all UPS Package Car Drivers and

11   Feeder Drivers.  See DUMF 9.  UPS and the Teamsters have negotiated a National Master

12   Agreement, as well as various local supplements, riders, and addenda that establish local terms,

13   conditions, and work rules that apply to particular geographic areas of the country.  See id.  The

14   National Master Agreement, the Northern California Supplemental Agreement and related

15   addenda applicable to workers in the Fresno Hub are referred to collectively as the "CBA."

16   DUMF 10.  Seniority governs virtually all of the key terms and conditions of a UPS employee's

17   employment.  DUMF 11.  Generally, UPS employees exercise their seniority rights to bid on a

18   particular job, and the most senior qualified individual is awarded the bid.  Id.

19   After working as a Package Car Diver for anywhere from a few months to several decades,

20   some employees choose to bid on a Feeder Driver position.  DUMF 14.  Feeder Driver jobs can be

21   less physically strenuous than Package Car Driver jobs, since feeder jobs do not involve delivering

22   hundreds of packages to customers each day.  Id.  There are several kinds of feeder jobs at UPS:

23   Feeder Driver, Shifter, Feeder Team Member, Feeder Driver (Non-Tractor Trailer), and Feeder

24   Relief Driver.  DUMF 16.[2]  All are full-time positions, which require full days of work, five days

25   per week.  Id.  The more senior feeder employees have their own assigned "bid" routes, which

26   they earned through the CBA's seniority-based bidding process, and which they drive every day.

27

28   [2] Without explanation or citation to any evidence, Plaintiff states that DUMF 16 is disputed.  Plaintiff's bare
     conclusory statement does not create a genuine dispute.  Bryant, 289 F.3d at 1167.  DUMF 16 is undisputed.

1   DUMF 17.  Relief Feeder Driver is the entry-level job in the Feeder Department, and most new

2   employees who join the Feeder Department will start as Relief Feeder Drivers.  DUMF 18.  Relief

3   Feeder Drivers do not have an assigned bid route, rather they cover the duties and bid routes of

4   other more senior feeder employees, who are out sick, on vacation, or otherwise unable to work.

5   DUMF 19.  There is no job description for a Relief Feeder Driver.  DUMF 20.  Rather, Relief

6   Feeder Drivers must be able to perform the essential job functions listed on the job descriptions

7   for Feeder Driver, Shifter, Feeder Team Member, and Feeder Driver (Non-Tractor Trailer).

8   DUMF's 19.[3]  Once a Relief Feeder Driver attains enough seniority, he or she is eligible to obtain

9   an assigned feeder route through the bidding process.  DUMF 21.

10          The CBA provides for rules governing Feeder Drivers.  See CBA Art. 31.  Under a section

11  entitled "Feeder Work," the CBA provides:  "It is agreed that necessary changes may be made

12  from time to time with respect to feeder operations.  In the event of disagreement the issues will be

13  subject to the grievance procedure."  CBA Art. 31 § 3.  The CBA also provides that when there is

14  "a lack of work," Feeder Drivers are "laid off" or reassigned into UPS's Package Division.  See

15  Defendant's Ex. D at Art. 31 § 6 ¶ 3.  On those weeks in which there are a "surplus" of Relief

16  Feeder Drivers, seniority determines which drivers can refuse to bid for a route and which drivers

17  are assigned to "package driving."  See id. at ¶ 8; see also DUMF 22; PRDUMF 22.  UPS

18  personnel have declared that, because the CBA requires Relief Feeder Drivers to perform Package

19  Car Driver duties when necessary, Relief Feeder Drivers must be able to perform the essential

20  functions of a Package Car Driver.  See Castillo Dec. ¶¶ 12, 13; Mays Dec. ¶¶ 5, 6.  Seniority

21  determines which Feeder Drivers get to stay in the Feeder Department and which are laid off into

22  the Package Department.  See DUMF 23.  If a Feeder Driver is laid off into the Package

23  Department, that driver can avoid working as a Package Car Driver by requesting the day off,

24
    _____
    [3] Gregory disputes DUMF's 19 and 20 by stating that "UPS provided only one job description for feeder to Dr.
25  Hanley," or "UPS provided Dr. Hanley [with] what it represented was a feeder position."  PRDUMF's 19, 20.  An
    actual dispute is not evident.  First, Dr. Hanley opined that Gregory could perform the job of Feeder Driver.  See
26  Defendant's Ex. O.  A Feeder Driver is not the same as a Relief Feeder Driver.  See DUMF 16.  That Gregory could
    perform the essential functions of a Feeder Driver does not necessarily speak to his ability to perform the essential
27  functions of a Relief Feeder Driver.  Second, Gregory is relying on events that occurred as part of his workers
    compensation proceeding.  However, he does not explain the significance of or the circumstances surrounding UPS's
28  submission of the Feeder Driver job description.  Without more, it is unknown how submission of the Feeder Driver
    description would preclude UPS from establishing the different job functions of a Relief Feeder Driver.

taking sick leave, or "no showing." See DUMF 24; PRDUM 24.  If a Feeder Driver requests the day off, UPS assess whether it has enough qualified drivers to deliver every single package in the center. See DUMF 24.

There are periods throughout the year (such as UPS's "peak season" in November and December) where UPS's package volume is so high that it needs every qualified driver to deliver packages, and does not permit days off.  DUMF 25.  Similarly, during highly-sought after vacation periods, demand for days off is so high that employees are required to bid for those days off in January of each year, and days off are awarded based on seniority pursuant to the CBA.  Id.  UPS will not permit days off during these high-demand periods, unless they are won through the bidding process.  Id.  Assuming UPS had enough qualified drivers to deliver all of its packages that day, and the driver was not requesting desirable days off, or time off during the peak season, UPS must first offer the day off to every other more-senior Package Car Driver in seniority order, pursuant to the CBA.  See DUMF 26.  UPS must also offer the day off to every other more-senior Relief Feeder Driver in seniority.  See id.  If every more-senior driver declines the day off, only then when would the CBA permit the requesting Relief Feeder Driver to go home.  DUMF 27.  Therefore, pursuant to the seniority system in its CBA, UPS cannot guarantee any Feeder Driver that he/she will not have to work as a Package Car Driver on any given day.  See id.  Furthermore, Feeder Drivers who are laid off into the Package Department, but fail to report to work in the Package Division, are disciplined with a "no call/no show."  Id.

In 2013, there were nine Relief Feeder Drivers in Fresno.  See Mays Dec. ¶ 7.  All nine Relief Feeder Drivers in Fresno were laid off into the Package Division for periods of at least three consecutive days.  See DUMF 28.  Relief Feeder Driver Robert Ruiz worked five consecutive months total as a Package Car Driver in 2013, see Ruiz Depo. 14:14-15:1, and Relief Feeder Driver Bryon Clay worked for about six consecutive weeks total as Package Car Driver in 2013.  See Clay Depo. 15:13-17.  During these periods, Clay and Ruiz had to perform Package Car Driver duties every day.  See DUMF 29.  Clay and Ruiz's bids for the Feeder Department were accepted as part of an August 2012 Feeder position posting.  See Clay Depo. 8:22-9-10; Ruiz Depo. 9:3-14.  As of September 2014, the last time that Clay and Ruiz had been laid off into the

1    Package Department was Summer 2013.  <u>See</u> Clay Depo. 13:21-23; Ruiz Depo. 14:14-15:4.  Of

2    the nine Relief Feeder Drivers in Fresno in 2013, Gregory had lower seniority to four drivers, but

3    was more senior to both Clay and Ruiz.  <u>See</u> Mays Dec. ¶ 8.

4         Gregory was hired by UPS in 2001 and was a member of the Teamsters at all relevant

5    times.  <u>See</u> DUMF 30.  He became a Package Car Driver in October 2005, with a senior date of

6    April 2006 for Union bidding purposes.  <u>See id.</u>  On October 18, 2010, while working as a

7    Package Car Driver, Gregory injured his knee.  DUMF 31.  On December 7, 2010, Gregory was

8    taken out of work by his physician due to his knee injury.  <u>Id.</u>  While he was out of work, Gregory

9    filed a claim for workers compensation benefits based on his knee injury, which was eventually

10   resolved in July 2013.  DUMF 32.  Ever since his injury in October 2010 Gregory has been

11   completely unable to perform the essential functions of his job as a Package Car Driver, either

12   with or without accommodation.  DUMF 33; <u>see also</u> DUMF's 58, 64.

13        In September 2011, Gregory's treating physician filled out a progress report in connection

14   with the workers compensation proceedings.  <u>See</u> Gregory Dec. ¶ 7 & Ex. C.  The progress report

15   released Gregory to "modified work" with restrictions of "limited use of right leg, walking and

16   standing up to 15 minutes per hour, with no repetitive climbing/squatting/kneeling, with

17   seated/sedentary work preferred."   <u>Id.</u> at Ex. C.  This progress report was submitted to UPS's

18   workers compensation attorney.  <u>See id.</u> at ¶ 7.  Further, UPS third-party administrator Gallagher

19   Bassett, Inc. attended the various doctor visits and made inquiries of Gregory's existing work

20   statuses.  <u>See id.</u>  Gregory's treating physician, Dr. Foxley, also believed that Gregory could return

21   to work with restrictions in June 2012, and agreed with restrictions that had been placed on

22   Gregory on or about July 2012 by the agreed upon medical examiner.  <u>See</u> Foxley Dec. ¶ 5.  Dr.

23   Foxley filled out a progress report in July 2012 that indicated Gregory could return to work with

24   restrictions.  <u>See id.</u> & Ex. A.

25        Gregory would speak with UPS risk management employee Lizzette Tafoya about his

26   work status as described by his doctor during his various visits, and he would request to return to

27   work.  <u>See</u> Gregory Dec. ¶ 7.  Tefoya has no recollection of ever instructing Gregory to contact

28   human resources about returning to work.  <u>See</u> Tafoya Depo. 27:21-28:1.  Following the

1    September 2011 and July 2012 progress reports, UPS did not contact Gregory to discuss

2    Gregory's limitations or possible accommodations.  See Gregory Dec. ¶ 8.

3          In May 2012, Gregory was considering other employment options within UPS in light of

4    his restrictions, and signed a bid that month for a Relief Feeder Driver position.  See id. at ¶ 9.

5    Brian Mays ("Mays"), the manager of the Fresno area Feeder Division, told Gregory that he would

6    be passed over for the position.  See id.  Mays explained that the reason was that Gregory needed

7    to be 100% and released to full duty.  See id.; see also Mays Depo. 57:6-9, 77:9-11.  Gregory

8    explained to Mays that he had not been released by his doctors to package car delivery, but had

9    been released to the Feeder Department.  See Gregory Depo. 54:17-55:12.  Other feeder positions

10    were posted in July and August 2012, but no one from UPS informed Gregory, and employees

11    with less seniority than Gregory were awarded the positions.  See Gregory Dec. ¶¶ 9, 10.

12          On December 4, 2012, Dr. Hanley, a physician who provided Qualified Medical

13    Examinations as part of the workers compensation proceeding, released Gregory to return to work

14    with the following restrictions:  "[Gregory] still has not become fit to return to his normal work

15    duties.  I talked with him about what he might be able to do and he does feel capable of driving a

16    truck and there are jobs in his profession that require only that (no loading or unloading), and in

17    any case he is not going back to work as a package car driver."  Defendant's Ex. M.  Within 10

18    days of the December 2012 release, UPS initiated the ADA interactive process by inviting

19    Gregory to apply for a reasonable accommodation.  See DUMF N.  Gregory applied for an

20    accommodation, and on December 20, 2012, UPS sent Gregory a packet of forms to be completed

21    by his medical provider that would give UPS additional information about his condition and the

22    way it impacted his ability to work.  DUMF 36.  Although UPS explained to Gregory the

23    importance of promptly returning the medical forms, Gregory did not do so.  See id.  On March 4,

24    2013, UPS had not received the medical forms and informed Gregory that it was treating his

25    accommodation request as withdrawn.  See DUMF 37.  On March 20, 2013, Gregory called UPS

26    and agreed to return the necessary medical forms to UPS once they were completed by his medical

27    provider.  See id.

28          Eventually UPS received a report from Dr. Hanley dated March 6, 2013, which evaluated

Gregory's condition to work at UPS as a Feeder Driver.  See DUMF 38.  Dr. Haney's report stated in part:

> I have already said more than once – at least temporarily when I first saw him and now permanently when I last saw him – that Mr. Gregory cannot perform the duties of a Package Car Driver.  My understanding is that up to 150 times a day, a Package Car Driver has to exit and re-enter the vehicle.  That means that he has to climb and descend stairs that entire time.  I also understand that the patient has to squat down or kneel down to obtain packages that are on the lower shelves of the package car.
> . . . . .
>
> With regard to Feeder Driver, my understand [sic] is – and correct me if I am wrong – that a Feeder Driver is required to drive a tractor-trailer.  That tractor-trailer is typically driven from Point A to Point B and the trailer is typically dropped or the trailer is unloaded.  The majority of the work activity has to do with negotiating the highways and byways of American with this tractor-trailer.
>
> I believe that Mr. Gregory at this point is perfectly capable of that, though if I am wrong, a trial of duty will rapidly tell us whether or not that's the case.  There is nothing about his condition that would prevent him from being a tractor-trailer driver, and it is my belief that he should be given the opportunity to do that.

Defendant's Ex. O.  Dr. Hanley had addressed questions that were posed by Defendant's counsel during the workers compensation proceedings in this report.  See id.

On May 8, 2013, UPS held an ADA "checklist" meeting with Gregory to speak with him directly about his abilities and restrictions, the kind of jobs he was interested in, and to identify suitable accommodations that could allow him to return to work.  DUMF41.  Gregory, Human Resources Manager George Thompson, and Human Resources Services Center Occupational Health Supervisor Brenda Hellerud participated in the checklist meeting.  DUMF 42.  During the meeting, the parties walked through UPS's Accommodation Checklist (Union) form, which UPS uses to facilitate a thorough and complete interactive process.  DUMF 43.  The primary purpose of the Checklist Form is to help UPS gather specific information about an employee's abilities and limitations so it can make suggestions on potential new jobs or job-related accommodations that the employee may be able to perform.  DUMF 44.  The employee is asked to help set parameters on the kinds of jobs or accommodations he would accept, such as whether he would accept a part-time job, a job outside of his metro area, or a non-union job in the event the job or accommodation he desires is not available or he is not qualified to perform its essential functions with or without accommodation.  DUMF 45.

Gregory testified that he filled out the Checklist Form honestly and truthfully, and included everything in his answers (he did not leave anything out).  DUMF 46.  In Paragraph 4 of the Checklist Form, Gregory confirmed that he could not work in his current position as a Package Car Driver, and, furthermore, there were no accommodations that would permit him to perform the essential functions of that job.  DUMF 47.  In Paragraph 5, Gregory was asked to identify any other jobs at UPS that he believed he could perform, to which he wrote:  Feeder and Shifter.  See DUMF 53.  In Paragraph 7, Gregory indicated that he would only accept jobs that were located in Fresno.  DUMF 52.  As a result, any available jobs outside of UPS's Fresno Hub were not considered as possible accommodations.  See id.  In Paragraph 8, Gregory stated that he would only consider reassignment to a part-time position if his hourly rate would not decrease.  DUMF 49.  This eliminated all part-time union positions for which Gregory was qualified, because his hourly rate as a full-time Package Car Driver was higher than the hourly rates of UPS's available part-time Union jobs in Fresno.  Id.  In Paragraph 10, Gregory indicated that he would not consider any non-Union (e.g. administrative) positions as an accommodation, which significantly limited UPS's ability to accommodate him.  DUMF 48.  For example, UPS would have considered any available part-time Small Sort or part-time Auditor positions for Gregory, but his hourly rate in either job would have decreased below what he had been earning as a Package Car Driver.  DUMF 50.  Additionally, Gregory may have been able to perform a full-time Customer Counter job or a Clerk job.  DUMF 51.  However, Gregory admits he did not have high enough seniority to qualify for any available Customer Counter or Clerk jobs, and therefore he was not qualified for the job (based on UPS's bona fide seniority system with the Teamsters).  Id.

Gregory explained that his responses to the Checklist Form reflect what he was instructed to put on the document by UPS employees.  See Gregory Dec. ¶ 14.  UPS did not advise Gregory either that it believed he could not perform the functions of a Feeder Driver or that he would be terminated if he was not selected for a Feeder Driver position.  See id.  Had Gregory been presented with a choice of termination or accepting some other lower paid position, whether full-time or part-time, he would have elected to continue employment in lieu of termination and the corresponding loss of benefits.  See id.

On July 12, 2013, UPS sent Gregory a letter to inform him of the West Region ADA Committee's decision.  See Defendant's Ex. Q; DUMF 65.  The letter stated in pertinent part:

> On May 8, 2013, we met to discuss your request for a job-related accommodation. I regret to inform you that after carefully reviewing your situation, we are not aware of any available position at UPS at this time for which you are qualified and capable of performing the essential job functions with or without reasonable accommodation.  Know that we will continue to look for such available position for up to six (6) months.  If your condition or abilities change in the future, however, or if you become aware of an open position that you believe you are capable of performing, please contact me so that we may re-evaluate your situation.

Defendant's Ex. Q.  Gregory's condition remains unchanged.  DUMF 66.  Gregory has unequivocally testified that he cannot work as a Package Car Driver, with or without accommodation, under any circumstances.  DUMF 64.

In June 2014, UPS posted a bid for two Relief Feeder Driver positions.  See Gregory Dec. ¶ 16.  Gregory was told that he could not sign the bid sheet because he was not an active employee and could not perform the job of Package Car Driver.  See id. at ¶ 17.  Gregory was not selected for the positions, even though he had more seniority than one of the employees selected.  See id. Had Gregory been selected for a Relief Feeder Driver position as late as 2014, he would have been able to obtain a permanent Feeder Department position.  See id. at ¶ 18.

On August 21, 2014, Gregory resigned from UPS in a letter that stated in pertinent part, "I . . . have decided that I am going to pursue a career in education . . . I am resigning as a UPS employee."  DUMF 67.

## DEFENDANT'S MOTION

### A.    First Cause of Action – Gov. Code § 12940(a)

#### *Defendant's Argument*

UPS argues that Gregory is not a "qualified individual" for purposes of § 12940(a). Gregory agrees that he could not perform the essential functions of a Package Car Driver.  This means that Gregory also could not perform the essential functions of a Relief Feeder Driver because Relief Feeder Drivers are laid off into the Packaging Department to deliver packages as Package Car Drivers.  There is no guarantee that Relief Feeder Drivers or Feeder Drivers will not

1    have to perform Package Car Driver duties from time to time.  Also, Relief Feeder Drivers are

2    expected to perform the essential functions of all the Feeder Department positions.  Dr. Hanley did

3    not consider the full range of physical duties that would be required to perform these jobs.

4    Further, the CBA requires Feeder Drivers to work as Package Car Drivers.  In order for Gregory to

5    work as a Relief Feeder Driver, UPS would have to make an exception to the CBA.  Violating or

6    making exceptions to the CBA and a seniority system are not reasonable accommodations.  Thus,

7    Gregory cannot show that he was a "qualified individual" and summary judgment is proper.

8           *Plaintiff's Opposition*

9           Gregory argues that he was told multiple times that he would not be considered for a

10   Feeder Driver position until he was 100% healed and released to full duty by his physician.  A

11   100% healed policy is a per se violation of FEHA.  Although UPS states that Gregory could not

12   perform the position of Feeder Driver because he cannot perform Package Car Driver duties, that

13   is contrary to the opinion of Dr. Hanley, who requested additional information from UPS if his

14   understanding of the Feeder Driver position was incorrect.  There is also a dispute whether

15   Gregory would have to perform Package Car Driver duties.  With his seniority and ability to take

16   time off, Gregory could have avoided delivery duties in the Package Department.  Moreover, the

17   CBA permits UPS and the Union to make changes with respect to the Feeder Department.  There

18   is no indication that UPS spoke to the Union about permitting Gregory to work a non-delivery

19   position in the Package Department if there was no work in the Feeder Department.  Finally, since

20   August 2013, no Relief Feeder Drivers have been laid off into the Package Department.

21          *Legal Standard*

22          FEHA "prohibits discrimination based on an employee's physical disability."  Green v.

23   State of California, 42 Cal.4th 254, 262 (2007); see Cal. Gov. Code § 12940(a).  However, an

24   "employer may discharge or refuse to hire a person who, because of a disability or medical

25   condition, is unable to perform his or her essential duties even with reasonable accommodation."

26   Ross v. RagingWire Telcom. Inc., 42 Cal.4th 920, 926 (2008); see Cal. Gov. Code § 12940(a)(1).

27   A plaintiff may establish a prima facie case of disability discrimination under FEHA if he shows

28   that he: (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was

1   subjected to an adverse employment action because of the disability.  Nealy v. City of Santa

2   Monica, 234 Cal.App.4th 359, 378 (2015); Furtado v. State Personnel Bd., 212 Cal.App.4th 729,

3   744 (2013).  A plaintiff is a "qualified individual" for a position "in the sense that he or she is able

4   to perform the essential duties of the position with or without reasonable accommodation."  Green,

5   42 Cal.4th at 267; Nealy, 234 Cal.App.4th at 378; Furtado, 212 Cal.App.4th at 744.  "'Essential

6   functions' means the fundamental job duties of the employment position the individual with a

7   disability holds or desires.  'Essential functions' does not include the marginal functions of the

8   position." Cal. Gov. Code § 12926(f); Lui v. City and Cnty of San Francisco, 211 Cal.App.4th

9   962, 971 (2012).  The identification of essential job functions is a "highly fact-specific inquiry."

10  Cripe v. City of San Jose, 261 F.3d 877, 888 n.12 (9th Cir. 2001);[4] Lui, 211 Cal.App.4th at 971.

11  Generally, the essential functions of a job are a question of fact.  Hastings v. Department of Corr.,

12  110 Cal.App.4th 963, 967 n.6 (2003).  "Evidence of whether a particular function is essential

13  includes, but is not limited to, the following:  (A) The employer's judgment as to which functions

14  are essential; (B) Written job descriptions prepared before advertising or interviewing applicants

15  for the job; (C) The amount of time spent on the job performing the function; (D) The

16  consequences of not requiring the incumbent to perform the function; (E) The terms of a collective

17  bargaining agreement; (F) The work experiences of past incumbents in the job; (G) The current

18  work experience of incumbents in similar jobs."  Cal. Gov. Code § 12926(f)(2); Lui, 211

19  Cal.App.4th at 977.  "Usually no one listed factor will be dispositive . . . ."  Id.

20       A "100% healed" or "fully healed" return to work policy is a per se violation of FEHA.

21  Department of Fair Empl. & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 747-48 (9th Cir. 2011);

22  UPS v. Department of Fair Employment and Housing, 2014 Cal. App. Unpub. LEXIS 3048, *36

23  n.5 (2014);[5] Gelfo v. Lockheed Martin Corp., 140 Cal.App.4th 34, 49 n.11 (2006).  Such a policy

24  discriminates against "qualified individuals" because it permits employers to substitute a

---

[4] When provisions of the federal Americans with Disabilities Act and FEHA are similarly worded, California courts look to federal decisions interpreting the ADA when applying FEHA.  Raine v. City of Burbank, 135 Cal.App.4th 1215, 1226 n.7 (2006).

[5] Despite state rules, the Court may consider unpublished state cases as persuasive authority.  See Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d 1178, 1189 n.4 (E.D. Cal. 2011).

1    determination of whether a qualified individual is "100% healed" from their injury for the required

2    individual assessment of whether the qualified individual is able to perform the essential functions

3    of his or her job with or without accommodation.  McGregor v. AMTRAK, 187 F.3d 1113, 1116

4    (9th Cir. 1999); Gelfo, 140 Cal.App.4th at 49 n.11.  But, an employer's "100% healed" policy

5    cannot give rise to liability under FEHA without the required inquiry into whether those affected

6    by the policy were disabled and able to perform the essential functions of the jobs at issue, with or

7    without reasonable accommodation.  See Hohider v. UPS, 574 F.3d 169, 195 (3d Cir. 2009);

8    Lopez v. Aramark Unif. & Career Apparel, 2012 Cal. App. Unpub. LEXIS 9416, *39 (2012).

9           *Discussion*

10          Gregory has declared that Mays, the manager of the Fresno Feeder Department, said in

11   May or June 2012 that Gregory would be passed over for a Relief Feeder Drivier position until

12   Gregory was 100% and released to full duty.  See Gregory Dec. ¶ 9.  Gregory was not selected for

13   the Feeder Department in May, July, and August 2012 and June 2014, even though he had more

14   seniority than some of those who were hired.  See id. at ¶¶ 9, 10, 17.  This is sufficient to indicate

15   that a 100% healed policy was enforced against Gregory, which is a per se violation of FEHA.

16   See Lucent Techs., 642 F.3d at 747-48; UPS, 2014 Cal. App. Unpub. LEXIS 3048 at *36 n.5;

17   Gelfo, 140 Cal.App.4th at 49 n.11.  However, Gregory must still be able to show that he could

18   perform the essential functions of the job he desired, with or without accommodation.  See

19   Hohider, 574 F.3d at 195; Lopez, 2012 Cal.App. Unpub. LEXIS 9416 at *39.

20          There is no dispute that Gregory was unable to perform the essential functions of a

21   Package Car Driver with or without accommodation.  See DUMF 33; Gregory Depo. 42:5-15.

22   The dispute is whether Gregory is able to perform the functions of a "Feeder Driver."  Whether

23   Gregory can perform the essential functions of this position is complicated by the parties' rather

24   loose use of the terms "Feeder Driver" and "Relief Feeder Driver."  These are separate positions,

25   see DUMF 16, yet at times it seems that the parties use the terms interchangeably.  A "Feeder

26   Driver" is a driver who has an established route in the Feeder Department, whereas a Relief

27   Feeder Driver provides cover for Feeder Drivers and other positions within the feeder department.

28   See DUMF 19.  Gregory acknowledges that based on seniority, he would enter the Feeder

1    Department as a Relief Feeder Driver.  <u>See</u> DUMF 54.  Therefore, the Court will focus on the

2    position of Relief Feeder Driver.

3         UPS makes two general arguments to show that Gregory is not a "qualified individual" for

4    a Relief Feeder Driver position.  First, Dr. Hanley did not review all of the physical demands

5    placed on a Relief Feeder Driver.  Second, Gregory would not be able to perform the essential

6    functions of a Package Car Driver if he were laid off into the Package Department.

7         With respect to Dr. Hanley, the Court is not persuaded by UPS's argument.  The Court

8    accepts for purposes of this motion that Relief Feeder Drivers need to be able to perform each

9    position within the Feeder Department.  <u>See</u> DUMF 19.  However, UPS does not explain what the

10   physical demands of the other jobs are, whether all of the physical demands are "essential

11   functions" of those jobs, or why Gregory would not be able to perform the essential functions of

12   the other Feeder Department jobs with or without accommodation.  UPS has merely alluded to

13   other physical demands/requirements of other Feeder jobs.  Without more, this does not meet

14   UPS's summary judgment burden.

15        With respect to the essential functions of a Relief Feeder Driver, the key is whether the

16   ability to perform the duties of a Package Car Driver is an "essential function" of a Relief Feeder

17   Driver.  There are numerous statutory factors that the Court must consider when evaluating

18   essential functions.  <u>See</u> Cal. Gov. Code § 12926(f)(2).

19        The first factor is the employer's judgment as to which functions are essential.  <u>See</u> Cal.

20   Gov. Code § 12926(f)(2)(A); <u>Lui</u>, 211 Cal.App.4th at 977.  UPS is in the business of delivering

21   packages.  UPS contends that there is not always work for Relief Feeder Drivers in the Feeder

22   Department.  When this happens, Relief Feeder Drivers are sent to the Package Department to

23   perform Package Car Driver duties.  UPS views this reassignment as required by the CBA.

24        The second factor is written job descriptions prepared before advertising or interviewing

25   applicants for the job.  <u>See</u> Cal. Gov. Code § 12926(f)(2)(B); <u>Lui</u>, 211 Cal.App.4th at 977.  No

26   pre-advertising or pre-interview job descriptions have been submitted by the parties.

27   Nevertheless, Gregory has submitted a UPS bid posting for a Relief Feeder Driver.  <u>See</u> Gregory

28   Dec. Ex. F.  The posting indicates that it was valid from June 13, 2014 to June 20, 2014.  <u>See</u> <u>id.</u>

15

1   A number of qualifications are listed, including age and licensing requirements.  See id.  The

2   posting states that the "Relief Feeder driver's responsibility is to cover Vacations, Absenteeism,

3   scheduled days off, and other temporary feeder coverage.  These Positions will be filled on an On-

4   Call basis, in Seniority order."  Id.  The posting also states that Relief Feeder Drivers may be

5   required to work weekends, may be required to report back after a certain number of hours of duty

6   time, may work in ice or snow, may apply and remove snow chains, and may be required to work

7   at night (which is the majority of feeder work).  See id.  There is nothing in the posting that

8   discusses being laid off into the Packaging Department.  See id.

9       The third factor is the amount of time spent performing the function.  See Cal. Gov. Code

10  § 12926(f)(2)(C); Lui, 211 Cal.App.4th at 977.  UPS indicates that being laid off into the Package

11  Department to perform package delivery is something that "routinely" occurs.  See DUMF 28.

12  UPS generally relies on the deposition testimony of Clay and Ruiz.  See id.  Clay and Ruiz

13  testified that they had both been laid off into the Package Department for extended periods of

14  time, ranging from six weeks to five months.  However, there is no evidence that such extended

15  periods of being laid off into the Package Department is common.  Also, Clay and Ruiz had the

16  least amount of seniority when they were laid off for these extended periods, and Gregory was

17  more senior to both Clay and Ruiz.  There is no discussion regarding whether someone with

18  Gregory's seniority would be required to spend extended periods of time as a Package Car Driver.

19  In fact, there is no evidence regarding how likely it is that someone with Gregory's seniority

20  would be laid off into Packaging at all.[6]  Gregory indicates that he is now more senior than nine

21  drivers, and he could take days off (vacation or sick leave), take "no shows," or bump less senior

22  drivers to cover for him if he were ever laid off into Packaging.  See Gregory Dec. ¶ 18.  Finally,

23  Clay and Ruiz's depositions were taken in September 2014, and both testified that they had not

24  been laid off into the Package Department since Summer 2013.  See Clay Depo. 13:21-23; Ruiz

25  Depo. 14:14-15:4.  That is, it had been about a year since they were last laid off into Package.

26

27  [6] UPS indicates that all of the Relief Feeder Drivers were laid off into the Package Department at some point in 2013.
    UPS submitted numerous worksheets/records in support of this contention.  However, there is no explanation given
    regarding how to read the worksheets and there is no summary provided for individual Relief Feeder Drivers.  The
28  Court will not page through the each of the worksheets in an attempt to glean their significance.  See Simmons, 609
    F.3d at 1017.

1    The fourth factor is the consequences of not requiring the incumbent to perform the

2    function.  See Cal. Gov. Code § 12926(f)(2)(D); Lui, 211 Cal.App.4th at 977.  Neither UPS nor

3    Gregory addresses this factor.  The Court therefore will view it as neutral.

4    The fifth factor is the terms of a collective bargaining agreement.  See Cal. Gov. Code §

5    12926(f)(2)(E); Lui, 211 Cal.App.4th at 977.  The CBA in this case provides that Relief Feeder

6    Drivers can be laid off into the Package Department if there is a "surplus" of drivers or a "lack of

7    work."  See Defendant's Ex. D at Art. 31 § 6 ¶¶ 6, 8.  Paragraph 8 indicates that the surplus Relief

8    Feeder Drivers will do "package driving."  See id. at ¶ 8.  From these sections, it is clear that the

9    CBA contemplates that Relief Feeder Drivers can be reassigned to the Package Department to

10   work as Package Car Drivers when there is a lack of work for the Relief Feeder Drivers.  What is

11   less clear is whether this is an inflexible rule.  As Gregory observes, Art. 31 § 6 does not expressly

12   forbid Relief Feeder Drivers from being assigned to non-Package Car Driver positions within the

13   Package Department.  There is a possible interpretation of the CBA that would permit assignment

14   to a position in the Package Department other than as a Package Car Driver.  Moreover, Art. 31 §

15   3 provides for flexibility with respect to the Feeder Department.  That section permits "necessary

16   changes" to be made from time to time "with respect to feeder operations."  See Defendant's Ex.

17   D at Art. 31 § 3.  If there is a disagreement as to a proposed change between the Teamsters and

18   UPS, the issue is subject to the CBA's grievance procedure.  See id.  A modification to effectuate

19   a FEHA accommodation could arguably fit within the purview of Art. 31 § 3.[7]  If the Union agrees

20   with a change and declines to file a formal grievance, there would not appear to be any violation

21   of the CBA.

22   The sixth factor is the work experiences of past incumbents in the job.  See Cal. Gov. Code

23   § 12926(f)(2)(F); Lui, 211 Cal.App.4th at 977.  Neither UPS nor Gregory addresses this factor.

24   The Court therefore will view it as neutral.

25   The seventh factor is the work experiences of incumbents in similar jobs.  See Cal. Gov.

26   Code § 12926(f)(2)(F); Lui, 211 Cal.App.4th at 977.  The deposition testimony of Clay and Ruiz

27

28   [7] The Court notes that violation of a seniority system under a CBA is a presumptively unreasonable accommodation.
See US Airways, Inc. v. Barnett, 535 U.S. 391, 403-06 (U.S. 2002).  However, there is no evidence that permitting
Gregory to work a non-Package Car Driver position in the Package Department would violate the seniority system.

1  pertains to this factor since both Clay and Ruiz are currently Relief Feeder Drivers.  As discussed

2  with respect to the third factor, the deposition testimony indicates that Clay and Ruiz were the

3  least senior Relief Feeder Drivers in 2013, Gregory has more seniority than both Clay and Ruiz,

4  Clay and Ruiz had extended periods of being laid off into the Package Department on or about

5  Summer 2013, but they have not been laid off into the Package Department since Summer 2013.

6        Finally, although not a statutorily enumerated consideration, Gregory's seniority is

7  significant.  There is no dispute that seniority governs many aspects of UPS's operations.  See

8  DUMF 11.  Gregory's declaration indicates that he has more seniority than nine current UPS

9  drivers, and in 2013 he would have been in the middle of the nine Relief Feeder Drivers in terms

10  of seniority.  Gregory declares that if he had been awarded a Relief Feeder Driver position as late

11  as 2014, he would have been able to obtain a permanent feeder position, which the Court takes to

12  mean a Feeder Driver with an established route.[8]  See Gregory Dec. ¶ 18.  Because Gregory

13  submitted his declaration in February 2015, and there was a June 2014 bid posting for a Relief

14  Feeder Driver position that Gregory signed, Gregory's declaration indicates that he would have

15  spent less than a year as a Relief Feeder Driver.

16        The identification of essential job functions is a "highly fact-specific inquiry" and, as such,

17  is generally a question of fact.  See Lui, 211 Cal.App.4th at 977; Hastings, 110 Cal.App.4th at 967

18  n.6.  This case falls within the general rule.  Although a jury could find for UPS on the essential

19  functions issue, they could also find for Gregory.  Cf. Holly D., 339 F.3d at 1175 (summary

20  judgment inappropriate where evidence supports conflicting inferences).  When the above

21  evidence is viewed in the light most favorable to Gregory, a reasonable jury could find that being

22  able to perform the job of Package Car Driver is not an essential function of a Relief Feeder Driver

23  of Gregory's seniority based on:  (1) the June 2014 bid posting's silence regarding the Package

24  Department; (2) Art. 31 § 3 of the CBA permitting changes to Feeder operations; (3) the CBA's

25  silence on whether a Relief Feeder Driver could be allowed to perform other jobs within the

26

27  [8] Although UPS states that it cannot guarantee that a Feeder Driver will never be sent to the Package Department, there is no evidence regarding how often Feeder Drivers are reassigned.  Further, it does not appear that UPS told Dr. Hanley that Feeder Drivers had to be able to perform Package Car Driver duties when it submitted a job description for a Feeder Driver position for his review.  There is insufficient evidence to indicate that being able to perform

28  Package Car Driver duties is an essential function of a Feeder Driver.

18

1  Package Department; (4) Clay and Ruiz's testimony regarding a lack of reassignment to the

2  Package Department for a year; (5) Gregory's ability to take time off, to no show, and to bump

3  nine less senior drivers; and (6) Gregory's apparent ability to attain a permanent Feeder Driver

4  position in less than a year's time.  Because the evidence indicates that Gregory may be a

5  "qualified individual" for the Relief Feeder Driver position, and the evidence indicates that

6  Gregory was subjected to a 100% healed policy, summary judgment on this claim is inappropriate.

7  **B.     Third Cause of Action – Gov. Code § 12940(n) – Interactive Process**

8  *Defendant's Argument*

9  UPS argues that Gregory was not released to work in any capacity until December 2012,

10  and his release from Dr. Hanley with respect to a Feeder Driver position did not occur until March

11  2013.  No accommodation was possible without a medical release to return to work, so there is no

12  liability before December 2012.  Once UPS received the December 2012 release, it began the

13  interactive process.  An ADA checklist meeting was held in which Gregory responded to

14  questions and filled out the checklist form.  As a result of his responses which created self-

15  imposed restrictions, the only unionized job that Gregory had seniority for was Relief Feeder

16  Driver.  However, based on his physical restrictions, Gregory could not perform the essential

17  functions of a Relief Feeder Driver because he could not perform the duties of a Package Car

18  Driver.  Therefore, there were no positions or accommodations available to Gregory.

19  *Plaintiff's Opposition*

20  Gregory argues that UPS failed to engage in a timely interactive process.  Although

21  Gregory received a release to work in December 2012, he had been released to modified duty in

22  September 2011 and Summer 2012.  Instead of an interactive process, UPS told Gregory that he

23  was ineligible for several Relief Feeder Driver positions because he could not perform Package

24  Car Driver duties and he needed to be 100% healthy.  The progress reports that UPS received

25  during the workers compensation process, Gregory informing Tafoya that he wanted to return to

26  work, and his applications for the Relief Feeder Driver positions, were sufficient to trigger UPS's

27  duty to engage in the interactive process.  Further, Gregory argues that UPS did not explain the

28  consequences of his various responses to the ADA checklist form during the May 2013 interactive

1    meeting.  If he had known that his answer would ultimately mean that he would not work, he

2    would have been willing to change his responses.

3         *Legal Standard*

4         Under FEHA, it is an unlawful employment practice to "fail to engage in a timely, good

5    faith, interactive process with the employee or applicant to determine effective reasonable

6    accommodations, if any, in response to a request for reasonable accommodation by an employee

7    or applicant with a known physical or mental disability or known medical condition."  Cal. Gov.

8    Code § 12940(n).  "The 'interactive process' required by the FEHA is an informal process with

9    the employee or the employee's representative, to attempt to identify a reasonable accommodation

10   that will enable the employee to perform the job effectively.  Ritualized discussions are not

11   necessary."  Scotch v. Art Institute of Cal., 173 Cal.App.4th 986, 1013 (2009); Wilson v. County

12   of Orange, 169 Cal.App.4th 1185, 1195 (2009).  "Although it is the employee's burden to initiate

13   the process, no magic words are necessary, and the obligation arises once the employer becomes

14   aware of the need to consider an accommodation."  Scotch, 173 Cal.App.4th at 1013; Gelfo v.

15   Lockheed Martin Corp., 140 Cal.App.4th 34, 62 n.22 (2006).  Once the interactive process is

16   initiated, the employer has a continuous obligation to engage in the process in good faith.

17   Swanson v. Morongo Unified Sch. Dist., 232 Cal.App.4th 954, 971 (2014); Scotch, 173

18   Cal.App.4th at 1013.  Both parties must participate in good faith in the interactive process, and

19   both parties have the obligations to keep communications open and to not obstruct the process.

20   Swanson, 232 Cal.App.4th at 971-72; Scotch, 173 Cal.App.4th at 1013.  Once there has been an

21   opportunity to conduct reasonable discovery on the issue, a § 12940(n) plaintiff "must identify a

22   reasonable accommodation that would have been available at the time the interactive process

23   should have occurred."  Nealy v. City of Santa Monica, 234 Cal.App.4th 359, 379 (2015); Scotch,

24   173 Cal.App.4th at 1018.

25        *Discussion*

26        Viewing the evidence in the light most favorable to Gregory, UPS was aware that Gregory

27   had been released to limited duty and that he wanted to return to work prior to December 2012.

28   Following his doctors visits, Gregory would inform Tafoya of his work status as described by his

1   doctors and request to return to work.  See Gregory Dec. ¶ 7.  UPS's attorneys were provided with

2   the September 2011 and July 2012 medical status reports, and a UPS third-party administrator

3   attended the medical visits.   See id.  Gregory also bid on a Relief Feeder Driver position as early

4   as May/June 2012 and informed Mays that he had been released for Feeder Department duty.  See

5   id. at ¶ 9; Gregory Depo. 54:17-55:12.  Based on this evidence, especially the statements to

6   Tafoya, a reasonable jury could find that UPS was put on notice that an interactive process was

7   necessary.  See Jackson v. Raley's, 2012 Cal.App. Unpub. LEXIS 8679, *36 (2012); Scotch, 173

8   Cal.App.4th at 1013; Gelfo, 140 Cal.App.4th at 62 n.22.

9        Relying on Gregory's deposition, a July 2013 grievance filed by Gregory, and reports filed

10  by Dr. Foxley in August 2012 and September 2012, UPS argues that Gregory had not been

11  released to any work prior to December 2012.  The Court disagrees.

12       First, Dr. Foxley authored two reports (August and September 2012) that stated Gregory

13  was to "remain off work" because he was classified as "temporary total disability."  See Naylor

14  Dec. Ex. 1.  However, Dr. Foxley had authored a report in July 2012 that permitted Gregory to

15  return to limited duty.  See Foxley Dec. Ex. A.  Dr. Foxley declared that, in his opinion, Gregory

16  was able to return to modified work duties in June 2012.  See Foxley Dec. ¶ 5.  Moreover, Dr.

17  Foxley explained that he had been advised by Gregory that UPS would not return Gregory to

18  active work until he could perform all of the duties of a Package Car Driver.  See id. at ¶ 8.

19  Because Gregory could not perform his usual and customary duties as a Package Car Driver, Dr.

20  Foxley gave him the designation of "temporary total disability."  See id.  This designation did not

21  mean that Gregory was unable to perform other jobs, rather it only meant that he could not return

22  to his position as a Package Car Driver.  See id. at ¶ 10.  In sum, Dr. Foxley's declaration shows

23  that he has not opined that Gregory was unable to perform any kind of work until December 2012.

24       Second, Gregory's July 2012 grievance stated in part that Gregory received a call from

25  Mays in mid-June 2012.  See Defendant's Ex. L.  Mays stated that Gregory was top of the list for

26  a feeder position.  See id.  Gregory told Mays that he wanted to go to the Feeder Department, but

27  "I had not been released to return to work."  Id.  However, in his deposition, Gregory clarified that

28  he meant that he had not been released to return to work as a Package Car Driver.  See Gregory

1    Depo. 54:23-55:6.  Gregory also testified that he told Mays that he in fact had been released to the

2    Feeder Department.  See id. at 55:3-12.  Viewing the evidence in the light most favorable to

3    Gregory, a reasonable jury could concluded that Gregory did not testify that he had not been

4    released to any work; instead, his testimony meant only that he had not been released back to his

5    position as a Package Car Driver.

6          Finally, UPS cites Page 64 of Gregory's deposition in which Gregory stated that he had not

7    been returned to work as of November 2012, the December 2012 medical report did not mention

8    the position of Feeder Driver, and that the March 2013 report by Dr. Hanley was the first time any

9    of the doctors said that Gregory could go to the Feeder Department.  See Gregory Depo. 64:1-15.

10   The questions leading up to this testimony are important.  Just prior to the cited section of Page

11   64, Gregory was directed by counsel to go back to the July 2013 grievance.  See id. at 63:13-64:1.

12   Gregory was asked to confirm that he had not been released to return to work as of mid-June 2012,

13   and Gregory so confirmed.  See id. at 63:13-22.  Gregory was then asked about another section of

14   the grievance in which he explained that he had called Mays in November 2012, expressed to

15   Mays that he still wanted the Feeder position, and that he expected to be released to work any day.

16   See id. at 63:23-64:1.  The portions of Page 64 cited by UPS then follow.  See id. at 64:1-15.  In

17   context, Page 64 is referring to the July 2013 grievance.  Given Gregory's previous clarification

18   that he meant only that he had not been released to return to work as a Package Car Driver, see id.

19   at 54:23-55:6, and given that counsel was asking questions in the context of the grievance, a

20   reasonable jury could conclude that Gregory did not mean that he had not been released to any

21   kind of work as of December 2012.[9]

22         In terms of positions or accommodations available to Gregory, there are several time

23   periods at issue based on medical reports that were generated.  Those periods are generally around

24   September 2011, June/July 2012, and December 2012/May 2013.

25

26   [9] To the extent that UPS is attempting to argue that Gregory had not been cleared to work in the Feeder Department
     until March 2013, the argument is unconvincing for purposes of summary judgment.  Gregory testified that Dr.
27   Hanley had told Gregory that Gregory was capable of performing the Feeder Driver position prior to March 2013.
     See Gregory Depo. 62:3-8.  Furthermore, Gregory told Mays that he had been cleared for Feeder Department duty.
28   See id. at 55:7-12.  Finally, in context, Gregory's response seems to indicate that the March 2013 report was the first
     time that any report had expressly stated that Gregory could perform Feeder Driver duties.  See id. at 64:9-15.

With respect to September 2011, there has been no evidence that any positions were available around September 2011 that Gregory could perform.  Without an available position that Gregory could perform with or without accommodation, there is no liability for failure to engage in the interactive process.  See Nealy, 234 Cal.App.4th at 379; Scotch, 173 Cal.App.4th at 1018. Gregory has had ample time to conduct discovery on this issue, but he has not identified an available position.  Therefore, summary judgment on a § 12940(n) claim based on the period around September 2011 is appropriate.  See id.

With respect to the June/July 2012 period, there is evidence that several Relief Feeder Driver positions were available around that time.  Gregory bid for Relief Feeder Driver positions beginning in late Spring 2012, and was not selected despite having more seniority than some of those who were selected.  As discussed above, there is a genuine disputed issue of material fact as to whether Gregory could perform the essential functions of a Relief Feeder Driver.  If Gregory could perform the essential functions of a Relief Feeder Driver, then there is sufficient evidence to show that a position would have been available to Gregory around the relevant time period.  See Nealy, 234 Cal.App.4th at 379; Scotch, 173 Cal.App.4th at 1018.  Summary judgment on a § 12940(n) claim based on the period around June/July 2012 is inappropriate.

Finally, with respect to December 2012/May 2013, that period is based on a December 2012 medical release and an interactive process meeting that occurred in May 2013.  Gregory's declaration indicates that UPS personnel told him what to write down on the ADA checklist form and did not explain the consequences of all his responses.  Given that UPS relies heavily on these responses, and states that Gregory's "self-limitations" on the ADA checklist severely limited the available accommodations, a jury could view UPS's failure to explain the consequences of the responses as indicative of bad faith.  Be that as it may, in sworn interrogatory responses, Gregory only identified feeder driver duties as a job that he could perform with or without accommodation. See DUMF 55.  There is no evidence that a Relief Feeder Driver position was available around December 2012 or May 2013.  The only evidence of a Relief Feeder Driver opening from December 2012 forward was for two openings in June 2014.  See Gregory Dec. ¶ 16.  Because Gregory has not presented evidence that there were positions, i.e. Relief Feeder Driver, available

1    around the December 2012/May 2013 time frame, he cannot recover for failure to engage in a

2    good faith interactive process.  See Nealy, 234 Cal.App.4th at 379; Scotch, 173 Cal.App.4th at

3    1018.  Summary judgment on a § 12940(n) claim based on the events surrounding December

4    2012/May 2013 is appropriate.

5          **C.**     **Second Cause of Action – Gov. Code § 12940(m)**

6          *Defendant's Argument*

7          UPS argues that the evidence demonstrates that Gregory could not perform the essential

8    functions of a Relief Feed Driver because his physical restrictions prevented him from performing

9    the duties of a Package Car Driver.  If UPS permitted Gregory to work as a Relief Feeder Driver,

10   but exempted him from performing Package Car Driver duties, it would be violating the seniority

11   system within the CBA.  Although UPS considered accommodating Gregory in other positions,

12   Gregory self-selected out of other positions based on salary, job location, and union affiliation.

13   UPS was only obligated to assign Gregory to another position within the company if there was an

14   existing and vacant position for which Gregory was qualified.  There was no such position.

15         *Plaintiff's Opposition*

16         Gregory's opposition is essentially a recapitulation of his prior arguments regarding the

17   interactive process and disability discrimination.

18         *Legal Standard*

19         FEHA prohibits an employer from failing "to make reasonable accommodation for the

20   known physical or mental disability of an . . . employee."  Cal. Gov. Code § 12940(m).  The

21   elements of a claim of failure to accommodate claim are: (1) the plaintiff has a disability covered

22   by FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to reasonably

23   accommodate the plaintiff's disability.  Furtado v. State Personnel Bd., 212 Cal.App.4th 729, 744

24   (2013); Cuiellette v. City of Los Angeles, 194 Cal.App.4th 757, 766 (2011).  A plaintiff is a

25   "qualified individual" if he can perform the essential functions of the desired job either with or

26   without accommodation.  Cuiellette, 194 Cal.App.4th at 766.  "Reasonable accommodation"

27   means "a modification or adjustment to the workplace that enables the employee to perform the

28   essential functions of the job held or desired."  Lui v. City & County of San Francisco, 211

                                                   24

Cal.App.4th 962, 971 (2012). "Reasonable accommodation" may include: (1) making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities; or (2) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. Cal. Gov. Code § 12926(o); Furtado, 212 Cal.App.4th at 745. An employer is not required to exempt an employee from performing essential functions or to reallocate essential functions of a job to other employees. Dark v. Curry County, 451 F.3d 1078, 1089 (9th Cir. 2006); Nealy v. City of Santa Monica, 234 Cal.App.4th 359, 375 (2015). The obligation to reassign an employee "does not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement." Furtado, 212 Cal.App.4th at 745. An employer will be liable under § 12940(m) "only if the work environment could have been modified or adjusted in a manner that would have enabled the employee to perform the essential functions of the job." Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal.App.4th 952, 975 (2008).

### *Discussion*

The issues and analysis for Gregory's § 12940(m) claim are extremely similar to the issues and analysis of his § 12940(a) claim. As discussed above, there is a genuine disputed issue of material fact regarding whether the ability to perform Package Car Driver functions is an essential job function of a Relief Feeder Driver. If the answer to that question is no, then UPS could have moved Gregory to one of the numerous Relief Feeder Driver openings in 2012 and June 2014, all of which Gregory appeared to have had sufficient seniority to attain. This would have been a reasonable accommodation. See Furtado, 212 Cal.App.4th at 745.

UPS argues that exempting Gregory from Package Car Driver duties would violate the seniority system of the CBA. It is true that an accommodation that violates a bona fide seniority system is presumptively unreasonable. See U.S. Airways v. Barnett, 535 U.S. 391, 402-06 (2002). However, UPS has not adequately shown how the seniority system would have been violated. As the Court understands the CBA, seniority merely determines who will be selected for open

1   positions within the Feeder Department.  There is no dispute that Gregory had enough seniority to

2   enter the Feeder Department in 2012 and 2014, and he would not be the least senior member of the

3   Feeder Department.

4       Because there are genuine disputed issues of material fact regarding the essential functions

5   of a Relief Feeder Driver (as discussed under the § 12940(a) claim), summary judgment on

6   Gregory's failure to accommodate claim is inappropriate.

7

8                                   **CONCLUSION**

9       UPS moves for summary judgment on the three FEHA causes alleged against it.

10      As to the first cause of action for disability discrimination under § 12940(a), although a

11  hotly disputed issue, a reasonable jury could conclude that Gregory was a "qualified individual"

12  because he would not need to be able to perform the functions of a Package Car Driver in order to

13  perform the essential functions of a Relief Feeder Driver.  Furthermore, a reasonable jury could

14  conclude that Gregory was subjected to a 100% healed policy.  Thus, summary judgment on this

15  claim will be denied.

16      With respect to the second cause of action for failure to accommodate under § 12940(m), a

17  reasonable jury could conclude that being moved to one of several open Relief Feeder Driver

18  positions in 2012 and June 2014 were reasonable accommodations that UPS failed to utilize.

19  Therefore, summary judgment on this cause of action will be denied.

20      As to the third cause of action for failure engage in the interactive process under  §

21  12940(n), a reasonable jury could conclude that UPS did not engage in an interactive process

22  around June/July 2012 despite being on notice of the need for an interactive process.  Furthermore,

23  there were open Relief Feeder Driver positions available around this time.  Therefore, summary

24  judgment on a § 12940(n) claim for the period around June/July 2012 will be denied.  However,

25  Gregory has failed to show that there were open positions available to him around September 2011

26  and December 2012/May 2013.  Thus, summary judgment on § 12940(n) claims based on events

27  surrounding the September 2011 and December 2012/May 2013 time periods will be granted.

28

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant's motion for summary judgment with respect to any California Government Code § 12940(n) claims based on the time periods of September 2011 and December 2012/May 2013 is GRANTED; and

2.  Defendant's motion for summary judgment is otherwise DENIED.

IT IS SO ORDERED.

Dated:   April 29, 2015       _____

SENIOR  DISTRICT  JUDGE