1

2

3

4

5                    **UNITED STATES DISTRICT COURT**

6                    **EASTERN DISTRICT OF CALIFORNIA**

7

8   MARSHALL GREGORY,                      CASE NO. 1:13-CV-2070 - SMS

9                    Plaintiff,            FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW
10       v.

11  UNITED PARCEL SERVICE, and DOES 1-
    25, Inclusive,
12
                     Defendants.
13

14

15         Plaintiff brought this action against his former employer United Parcel Service ("UPS" or

16  "Defendant") for violations of the California Fair Employment and Housing Act for disability

17  discrimination, failure to accommodate his disability, and failure to engage in the interactive

18  process (Cal. Govt. Code §§ 12940(a), (m), (n)). Plaintiff was a UPS "package driver" until his

19  injury precluded him from performing that position with or without accommodation. He sought,

20  and believed he could perform, a "relief feeder driver" position. Defendant argued that Plaintiff

21  was not qualified for the desired accommodation because a relief feeder driver must be able to

22  drive package routes when there is no feeder route available. The parties agree that Defendant's

23  liability turns on whether or not the ability to perform as a "package driver" was an essential

24  function of the "relief feeder driver."

25         In June 2015, the Court conducted a three-day bench trial in this matter. The Court has

26  now taken live testimony, received deposition testimony, and numerous exhibits. The parties have

27  completed all briefing and made their final arguments. After considering the evidence and the

28  arguments, the Court concludes that package driving is an essential function of the relief feeder

1  driver position; and, as such, Plaintiff has not met his requisite burden to demonstrate that he was

2  qualified for the desired position. Judgment will be entered in favor of Defendant.

3     I.     FINDINGS OF FACT

4     Plaintiff was a UPS employee in Fresno, CA from March 2001 until he resigned in August

5  2014. RT 201:5-6; Exh. T.

6     Plaintiff was a member of a union and the terms and conditions of his employment with

7  UPS were governed by a collective bargaining agreement (the "CBA"), entered into by UPS and

8  several local unions. RT 548:1-549:7; 550:8-10; Exh. A at p.1.

9     Seniority governs virtually all of the key terms and conditions of a UPS employee's

10  employment. See Exh. A, at pp. 9-17. Principles of seniority are given "prime consideration in the

11  everyday operation of the business." Exh. A. at p. 16.

12     Plaintiff became a full-time employee as a package car driver in May 2006. RT 202:9-13.

13     Fresno employs over two hundred full-time package drivers. RT 92:22-24. The bulk of

14  full-time UPS employees are package drivers. 93:13-15.

15     Plaintiff sustained a work-related injury to his right knee in October 2010. RT 205:22-

16  206:2.

17     Plaintiff's injury precluded him from performing his regular package car duties. RT

18  313:23-314:4, 354:5-13.

19     When Plaintiff initially returned to work, he performed duties other than his regular

20  package car duties. These modified duties included missed routes, air shuttle, and folding bags.

21  RT 207:14-22. These duties were normally done by full-time workers who want "left-over" work

22  after all the drivers had been dispatched for the day. RT 209:14-18.

23     Plaintiff was taken off work for workers' compensation purposes in December 2010 and

24  underwent surgery to the right knee in February 2011. RT 210:1-12.

25     Plaintiff was released to work with restrictions in June 2011. RT 258:4-17; Exh. 2.

26     Local manager Karen Taylor advised Plaintiff that UPS no longer had a light duty policy.

27  RT 261:1-9.

28     Plaintiff was not willing to accept a non-union administrative position as an

1    accommodation. RT 373:9-19; Exh. Q at p.3.

2           In or about 2012, Plaintiff sought a position in the feeder department. RT 269:19-270:4,

3    270:24-271:4; Exh. Q at p.2.

4           A feeder driver's duties mostly consist of driving between UPS locations, but also include

5    inspecting and handling equipment and assembling trailers, and may require customer pick-ups

6    and cleaning trailers of debris and pallets. RT 10:6-13, 10:24-25, 12:14-16.

7           Any UPS employee seeking to enter the feeder department must first bid on a relief feeder

8    driver, the entry feeder department position. RT 32:13-34:19; Exh. A at p. 64. Typically, bids for

9    relief feeder driver are open to full-time employees coming out of the package ranks. RT 93:1-3.

10          A relief feeder driver's responsibility is to cover a feeder job that has been temporarily

11   vacated due to the driver being on vacation or leave. RT 111:4-13; Exh. A at p. 63; Exh. 20. Relief

12   feeder driver positions are filled on an on-call basis, in seniority order. Exh. 20. If a relief feeder

13   driver is not needed to cover for anyone in the feeder department, they return to the package

14   department. RT 111:20-22; Exh. A at 63, 64.

15          Pursuant to the CBA, relief feeder drivers are assigned routes in seniority order. Relief

16   feeder drivers bid on relief positions off the relief feeder list in seniority order. On weeks where

17   there are surplus relief feeder drivers, seniority will determine which drivers can refuse to bid

18   feeder jobs and be assigned to package driving for that week. While in package, if unplanned

19   feeder jobs develop, they are to be filled by seniority. Exh. A pp. 64-65.

20          The relief feeder drivers with the least seniority are the first to be returned to package. RT

21   562:5-20.

22          The feeder schedule is posted on the prior Thursday or Friday for the week beginning on

23   Sunday. RT 243:4-18.

24          A relief feeder driver without a feeder route is sent back to the package department. The

25   more senior driver may bump a less senior package driver and take that route. RT 62:21- 63:13.

26   The bumped driver may in turn bump anyone below him or her in seniority. This bumping process

27   continues until all bumping by seniority is completed. Exh. A at p.64.

28          When a package driver enters the feeder department as a relief feeder driver, he or she is at

3

the bottom of the seniority list in the feeder department, regardless of his or her overall seniority at

UPS, until the following April. Upon the following April, full-time seniority for drivers is

reorganized, and the driver might jump several places in the feeder seniority list. RT 55:16-56:5;

561:1-16.

If Plaintiff had the highest seniority of any feeder driver, he would still enter the feeder

department with the lowest seniority until the next April. RT 561:17-22.

Upon the annual bid in April, feeder drivers may bid on a permanent route. RT 124:3-

Permanent feeder drivers are not returned to package driving unless they choose to do so. RT

124:8-17; Exh. D.

UPS posted bids for relief feeder driver in March 2012, twice in May 2012, July 2012,

August 2012, and June 2014. The March 2012 bid was given to a driver with more seniority to

Plaintiff. RT 98:8-102:18; Exhs. 5-9.

Plaintiff did not sign the May 12, 2012, July 2012 or August 2012 bid sheets because he

was not aware of them. RT 273:13-16, 274:12-14, 276:2-4.

Plaintiff signed the May 29, 2012 bid sheet. He was informed of the bid sheet by peers at

work. RT 263:12-19. As the most senior bidder, he received this bid, but he did not eventually get

the job. RT 270:12-15; Exh. 7.

Plaintiff had been cleared by his physician in December 2012 to work in a feeder position.

Exh. 11. The physician was given the job descriptions of "feeder shifter" and "feeder utility."

281:22-282:4.

A bid list in 2014 included a brief job description and list of requirements. It stated: "The

Relief Feeder driver's responsibility is to cover Vacations, Absenteeism, scheduled days off, and

other temporary Feeder coverage [*sic*]." Exh. 20.

The bid lists in 2012 do not appear to have included a job description. See Exhs. 5, 7-9.

The training process for relief feeder driver takes between four weeks to three months. RT

37:11-12.

Bryon Clay and Robert Ruiz were selected from the August 2012 bid sheet. RT 53:24-

54:2. Nick Dhuyvetter was selected from the June 2014 bid sheet. RT 59:17-25. Between May

1  2012 and June 2014, no other relief feeder drivers were selected by UPS in Fresno. RT 98:8-

2  102:18; Exhs. 5, 7-9.

3      Bryon Clay began his position as relief feeder driver in December 2012. In 2013, he was

4  sent back to the package department for approximately ninety days, twenty-two of which were

5  prior to April. RT 230:13-17; Exh. D.

6      Robert Ruiz began his position as relief feeder driver in January 2013. In 2013, he was sent

7  back to the package department from March through August. Thirteen of those days were prior to

8  April. RT 146:9-12, 162:20-22; Exh. D.

9      Nick Dhuyvetter began his position as relief feeder driver sometime after June 2014.

10  Between January 2015 and April 2015, he was sent back to the package department approximately

11  twenty-one days. RT 116:21-117:14.

12      Feeder drivers with full benefits receive nine sick days per year. RT 117:20-22; Exh. A at

13  p. 423.

14      Drivers must schedule their vacation days in advance, which vacations are granted in

15  seniority order. RT 118:8-12, 571:5-16; Exh. A at pp. 48, 49. UPS drivers may take a minimum of

16  one week of vacation at a time. RT 573:10-17.

17      Attendance-related infractions, such as tardiness or no-shows, are subject to discipline. RT

18  139:18-140:3, 574:20-575:13.

19      In practice, occasional no-shows do not have significant consequences. Eight to ten no-

20  shows does not necessarily result in the loss of employment. RT 150:24-151:3.

21      In practice, a relief feeder driver may occasionally decline being returned to package

22  without consequence. This can be done by taking a sick day or requesting not to work and taking

23  an unpaid day off if there are other drivers and no driver with more seniority wants the day off. RT

24  149:4-20, 231:2-7, 573:20-574:6.

25  II.   LEGAL STANDARDS

26  A.  Discrimination

27      FEHA "prohibits discrimination based on an employee's physical disability." *Green v.*

28  *State of California*, 42 Cal.4th 254, 262 (2007); see Cal. Gov. Code § 12940(a). However, an

1  "employer may discharge or refuse to hire a person who, because of a disability or medical

2  condition, is unable to perform his or her essential duties even with reasonable accommodation."

3  *Ross v. RagingWire Telcom. Inc*., 42 Cal.4th 920, 926 (2008); see Cal. Gov. Code § 12940(a)(1).

4  A plaintiff may establish a prima facie case of disability discrimination under FEHA if he shows

5  that he: (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was

6  subjected to an adverse employment action because of the disability. *Nealy v. City of Santa*

7  *Monica*, 234 Cal.App.4th 359, 378 (2015); *Furtado v. State Personnel Bd*., 212 Cal.App.4th 729,

8  744 (2013).

9  　　　A plaintiff is a "qualified individual" for a position "in the sense that he or she is able to

10  perform the essential duties of the position with or without reasonable accommodation." *Green*, 42

11  Cal.4th at 267; *Nealy*, 234 Cal.App.4th at 378; Furtado, 212 Cal.App.4th at 744. "'Essential

12  functions' means the fundamental job duties of the employment position the individual with a

13  disability holds or desires. 'Essential functions' does not include the marginal functions of the

14  position." Cal. Gov. Code § 12926(f); *Lui v. City and Cnty of San Francisco*, 211 Cal.App.4th

15  962, 971 (2012). The identification of essential job functions is a "highly fact-specific inquiry."

16  *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001);4 *Lui*, 211 Cal.App.4th at 971.

17  Generally, the essential functions of a job are a question of fact. *Hastings v. Department of Corr*.,

18  110 Cal.App.4th 963, 967 n.6 (2003).

19  　　　"Evidence of whether a particular function is essential includes, but is not limited to, the

20  following: (A) The employer's judgment as to which functions are essential; (B) Written job

21  descriptions prepared before advertising or interviewing applicants for the job; (C) The amount of

22  time spent on the job performing the function; (D) The consequences of not requiring the

23  incumbent to perform the function; (E) The terms of a collective bargaining agreement; (F) The

24  work experiences of past incumbents in the job; (G) The current work experience of incumbents in

25  similar jobs." Cal. Gov. Code § 12926(f)(2); *Lui*, 211 Cal.App.4th at 977. "Usually no one listed

26  factor will be dispositive . . . ." *Id*.

27  　　　B.  <u>Failure to Accommodate</u>

28  　　　FEHA prohibits an employer from failing "to make reasonable accommodation for the

1  known physical or mental disability of an . . . employee." Cal. Gov. Code § 12940(m). The

2  elements of a claim of failure to accommodate claim are: (1) the plaintiff has a disability covered

3  by FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to reasonably

4  accommodate the plaintiff's disability. *Furtado v. State Personnel Bd.*, 212 Cal.App.4th 729, 744

5  (2013); *Cuiellette v. City of Los Angeles*, 194 Cal.App.4th 757, 766 (2011). A plaintiff is a

6  "qualified individual" if he can perform the essential functions of the desired job either with or

7  without accommodation. *Cuiellette*, 194 Cal.App.4th at 766. "Reasonable accommodation" means

8  "a modification or adjustment to the workplace that enables the employee to perform the essential

9  functions of the job held or desired." *Lui v. City & County of San Francisco*, 211 Cal.App.4th 962,

10  971 (2012). An employer will be liable under § 12940(m) "only if the work environment could

11  have been modified or adjusted in a manner that would have enabled the employee to perform the

12  essential functions of the job." *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal.App.4th

13  952, 975 (2008).

14        C.  <u>Failure to Engage in the Interactive Process</u>

15        Under FEHA, it is an unlawful employment practice to "fail to engage in a timely, good

16  faith, interactive process with the employee or applicant to determine effective reasonable

17  accommodations, if any, in response to a request for reasonable accommodation by an employee

18  or applicant with a known physical or mental disability or known medical condition." Cal. Gov.

19  Code § 12940(n).  "[A] § 12940(n) plaintiff "must identify a reasonable accommodation that

20  would have been available at the time the interactive process should have occurred." *Nealy v. City*

21  *of Santa Monica*, 234 Cal.App.4th 359, 379 (2015); *Scotch v. Art Institute of Cal.*, 173

22  Cal.App.4th 986, 1018 (2009).

23  III.    CONCLUSIONS OF LAW

24        Plaintiff argues that the ability to perform package driver duties was not an essential

25  function of the relief feeder driver position because an insignificant amount of a relief feeder

26  driver's time was spent performing package driver duties, several other drivers could perform the

27  package driver duties, and a relief feeder driver could avoid performing the package driver duties

28  without much consequence. Defendant argues that UPS policy, the CBA, and UPS employees all

1  admit that package driver duties are essential functions of the relief feeder driver position.

2  Defendant argued that Plaintiff's claims that he could have avoided package driving are highly

3  speculative and unrealistic. The Court considers several factors when evaluating a position's

4  essential functions.

5      A.  Relevant Statutes

6      FEHA provides two sections which identify reasons a job function may be considered

7  essential. Plaintiff relies on the first section (12926(f)(1)), which states:  "(A) The function may be

8  essential because the reason the position exists is to perform that function. (B) The function may

9  be essential because of the limited number of employees available among whom the performance

10  of that job function can be distributed. (C) The function may be highly specialized, so that the

11  incumbent in the position is hired for his or her expertise or ability to perform the particular

12  function." This section anticipates a job function that is uncommon or specialized, such as feeder

13  driving, which requires more training than a package driving. Feeder driving is an essential

14  function of the relief feeder driver position for the three reasons above. The more relevant section

15  to determine whether the less-specialized function of package driving is an essential function of

16  relief feeder driver is the second section (12926(f)(2)), which was identified earlier in this order,

17  each element of which will be discussed individually below.

18      B.  Employer's Judgment

19      The first factor in determining whether a particular function is essential under section

20  12926(f)(2) is the employer's judgment as to which functions are essential.  UPS emphasized that

21  their primary business is delivering packages, that a relief feeder driver is actually a package

22  driver with a special qualification to drive feeder routes to provide relief to permanent feeder

23  drivers on an as-needed basis, and that package driving is an essential function of the relief feeder

24  position.

25      C.  Written Job Descriptions

26      The second factor is written job descriptions prepared before advertising or interviewing

27  applicants for the job. The only job description provided for relief feeder driver was on the 2014

28  bid posting. It does not explicitly say that relief feeder drivers will be returned to package driving,

but, by stating that the relief feeder driver provides temporary feeder coverage, it implies that the full-time relief feeder driver will be performing other work outside of the feeder department when not providing temporary coverage in the feeder department. Therefore, it is more probable than not that the other work would be package driving because the bulk of UPS drivers are package drivers and most feeder drivers were promoted from the package department. When viewed together with the CBA, discussed below, it becomes clear that the relief feeder driver's time spent not driving feeder routes is spent driving package routes.

D.  Time Spent Performing the Function

The third factor is the amount of time spent performing the function. Plaintiff argues that there is a possibility, but "certainly not a probability," that Plaintiff would be returned to package driving given his seniority, and that the insignificant amount of time required to perform package driving renders it a marginal function. Defendant presented evidence that all relief feeder drivers are sent to package driving for extended periods of time, at least as long as they are the least senior relief feeder driver.

"Where other considerations support a finding that a function is essential, the function 'need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential.'" *Lui*, 211 Cal.App.4th at 978 (*citing Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. Ill. 2001)). Employees were not qualified individuals when the activity from which they were precluded were not part of the regular duties, but was incidentally inevitable. *Kees v. Wallenstein*, 161 F.3d 1196, 1199 (9th Cir. 1998).

The exact amount of time a relief feeder driver spends driving package varies, as relief drivers are needed to cover unknown variables such as absenteeism, vacation, and other kinds of leave. The feeder schedules were made and posted only a few days in advance of the work week. Over a relief feeder driver's tenure, prior to obtaining a permanent feeder route, he or she may spend a very insignificant percentage of working time packaging driving. However, it is clear from the evidence that a significant portion of any incoming relief feeder driver's time is spent driving package, at least while they are at the bottom of the feeder seniority list. Every driver entering the feeder department begins as a relief feeder driver, and enters at the bottom of the feeder seniority

9

1  list regardless of their overall seniority at UPS. The new relief feeder driver will remain at the

2  bottom of the feeder seniority list until the following April, when seniority is reorganized. If

3  Plaintiff had been selected for relief feeder driver in May or August 2012, as he believed was

4  proper, he would have been the least senior relief feeder driver until April 2013. Further, each of

5  the three relief feeder drivers hired during the relevant time spent significant time package driving

6  between the time they began the position and the following April.

7      For example, Robert Ruiz worked the least amount of days as a relief feeder driver prior to

8  the seniority reorganization in April. He was hired as a relief feeder driver off of the August 2012

9  list and began his position in March 2013, two months after Bryon Clay who was also hired off of

10  the same list. During Robert Ruiz' first month, he spent thirteen days as a package driver and

11  seven days as a relief feeder driver. During the first week of April 2013, every working relief

12  feeder driver spent the five-day week as a package driver except Robert Ruiz, who worked one

13  day in feeder. Had Plaintiff been hired instead of Robert Ruiz, Plaintiff would have been returned

14  to package driving approximately seventeen days, assuming arguendo that he would have jumped

15  in seniority in April 2013 and not been returned to package driving after that. However, Plaintiff

16  argues that he should have been selected off of the May 29, 2012 bid list, which would have

17  placed him in the bottom of the feeder department for much longer, and would have required

18  many more days package driving as evidenced by Bryon Clay's total of twenty-two days spent

19  driving package in January, February, and March of 2013.

20      Considering the significant number of days any incoming relief feeder driver is returned to

21  package driving, it is unrealistic to imagine that a relief feeder driver could avoid package driving

22  by missing several weeks or months of work altogether. A relief feeder driver being returned to

23  package driving is inevitable, especially while he or she is the least senior relief feeder driver.

24  More senior relief feeder drivers are also occasionally returned to package driving.

25      There would be no way for UPS to guess how many days Plaintiff would be returned to

26  package driving. If Plaintiff could have been very lucky and returned to package driving only a

27  few days and was able to avoid package driving for those few days, that would not change the

28  clear evidence that relief feeder drivers usually spend a significant portion of time of their first

1   year in that position package driving. Even looking in retrospect, Plaintiff would have spent

2   significant time returned to package if he had gotten any of the bids for which he qualified.

3       E.   Consequences of Not Requiring the Incumbent to Perform the Function

4       The fourth factor is the consequences of not requiring the incumbent to perform the

5   function. Plaintiff could not avoid being returned to package driving because being returned to

6   package driving is based strictly on seniority. Plaintiff instead argues that he could have avoided

7   actually performing the package driving function on days he was returned to package driving by

8   taking sick days, vacation, or unpaid days off.  Defendant insists that discipline would be

9   administered to any driver who failed to show up to work or refused to work their scheduled shift.

10      The evidence demonstrates that, although UPS policy may dictate otherwise, UPS drivers

11  routinely were able to take sick days or request an unpaid day off if they did not want to work the

12  route assigned. Bryon Clay, Robert Ruiz, and Plaintiff testified that drivers did not receive

13  discipline for taking unpaid days off, as long as there were other drivers to cover the route. UPS

14  maintained over two hundred package drivers who want to work. It was not uncommon for a

15  driver who did not want to work the assigned route to leave for the day without disciplinary

16  action. Robert Ruiz estimated that he could just go home if he did not want the assigned package

17  route "nine times out of ten."

18      This evidence supports a conclusion that a relief feeder driver may occasionally refuse a

19  package route by taking some of their nine sick days or unpaid days off. However, the evidence

20  does not support a finding that a relief feeder driver may take several weeks or months away from

21  work when he or she is returned to package driving for an extended period of time. In addition, a

22  relief feeder driver could not use vacation days to avoid package driving because vacation days are

23  selected in March of every year, well in advance of knowing when the relief feeder driver would

24  be returned to package driving. As discussed above, relief feeder drivers are returned to package

25  driving for several weeks or months at a time during their initial several months as a relief feeder

26  driver. It was not specifically discussed what discipline would be administered for a driver who

27  continuously refused an assigned package route, while other package drivers were available to

28  cover the route. Robert Ruiz' "nine times out of ten" comment suggests that he was not always

11

1   able to go home for the day if he did not want the package route. The overall evidence suggests

2   that taking several weeks or months away from work is not an available option.

3         It may not seem remarkably burdensome to require Defendant to allow Plaintiff to take

4   several weeks of unpaid time off as long as there are a sufficient amount of package drivers

5   willing and available to drive the routes. However, the testimony revealed that another package

6   driver is not always available to do the work, which would leave that route uncovered for that day.

7         Furthermore, it would be a violation of the CBA seniority policy to allow Plaintiff to work

8   as a relief feeder driver without requiring him to be assigned to package driving when there is no

9   available feeder route. Only feeder drivers with permanent routes are not returned to package

10   driving, which requires sufficient seniority and the availability of a bid for a permanent route.

11         Plaintiff suggests that he may have been able to perform jobs in the package department

12   other than package driving, such as "light duty" functions of driving missed routes and air shuttle.

13   However, the light duty functions were not full-time work but done by full-time workers who

14   wanted extra work at the end of the day. During the relevant time, it was not available as a matter

15   of policy. In addition, the CBA explicitly states that relief feeder drivers are assigned to "package

16   driving," which does not include functions other than package driving.

17        F.  Terms of a Collective Bargaining Agreement

18         The fifth factor is the terms of a collective bargaining agreement. The CBA clearly

19   contemplates that relief feeder drivers are to be assigned to "package driving" when there is a lack

20   of work in the feeder department.

21         The CBA also has a prohibition on extra-contract agreements, which would preclude the

22   parties from exempting Plaintiff from package driving. RT 564:20-565:2; Exh. A at UPS bate #

23   385.

24        G.  Experiences of Past and Current Incumbents

25         The sixth factor is the work experiences of past incumbents in the job. The seventh factor

26   is the work experience of incumbents in similar jobs. As discussed, each incoming relief feeder

27   driver in 2012 and 2014 was returned to package driving for extended periods of time during their

28   first few months in their position. Bryon Clay spent approximately ninety days package driving in

1    2013, while Robert Ruiz spent approximately five months package driving in 2013. Other relief

2    feeder drivers were occasionally assigned to package driving in 2013 as well. No relief feeder

3    drivers were returned to package driving in 2013 after September 2013. Between January and

4    April 2015, Nick Dhuyvetter spent approximately twenty-one days package driving. Past and

5    current relief feeder drivers all were assigned to package driving at least occasionally, while the

6    three most recent relief feeder drivers were assigned to package driving for weeks and months at a

7    time.

8         H.  Summary

9         Plaintiff and Defendant are bound by terms of CBA which provides that any driver

10   entering feeder department may only enter as relief feeder driver and would be placed at the

11   bottom of seniority list until the following April, during which time he or she would be returned to

12   package driving  for more days than may reasonably or permissibly be taken as sick days or

13   unpaid days off. Hence, package driving is necessarily performed by relief feeder drivers, at least

14   as long as they are at the bottom of seniority list. Package driving would have been required of

15   Plaintiff if he had won any of the available bids in 2012 or 2014.

16        Each factor discussed above weighs in favor of Defendants; some weigh more heavily than

17   others. UPS asserts that package driving is an essential part of the relief feeder position. The CBA

18   explicitly confirms this intention, while the written job description on the 2014 bid sheet implies

19   that relief feeder drivers will spend part of their time package driving. Each incoming relief feeder

20   driver spends a significant amount of time package driving. More senior relief feeder drivers also

21   spend some days package driving. It was not possible to miss several consecutive weeks or

22   months of work to avoid package driving.

23        Package driving is an essential function of the relief feeder position.

24        Plaintiff was not able to perform package driving duties, and therefore, has not met his

25   burden to prove that he was qualified for the position he sought. Plaintiff cannot prevail on any of

26   his three causes of action without proving that he was qualified to perform the essential functions

27   of the desired position. Hence, there is no need for the Court to discuss the remaining elements of

28   Plaintiff's claims.

1    IV.    ORDER

2           The clerk shall enter judgment in favor of Defendant and against Plaintiff.

3

4

5

6    IT IS SO ORDERED.

7    Dated:   **September 8, 2015**            **/s/ Sandra M. Snyder**
                                        UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28